[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Findings Re: Petition For Termination Of Parental Rights
The child's date of birth is March 19, 1987; she was committed to the care and custody of the Commissioner of the Department of Children and Youth Services (DCYS) as an uncared for/homeless child on October 14, 1988.[1] The mother of the child is Jacqueline W., d/o/b April 17, 1956; the father is Elke C., d/o/b July 12, 1961.[2]
CT Page 5803
The instant petition to terminate parental rights was filed October 22, 1991.[3] With respect to respondent/mother, the petition alleges statutory grounds for termination under General Statutes Section 17a-112 (formerly Section 17-43a)(b)(1) (Abandonment), (2) (Failure to Rehabilitate), and (4) (No Ongoing Parent-Child Relationship). On November 19, 1991, the petition was amended, on motion of DCYS, with regard to respondent/father to allege consent.
Notice And Jurisdiction
Jacqueline W.'s address is shown on the termination petition as: c/o Gertrude W., 16 Vine Street, Apt. 1, Hartford; Elke C.'s address is set forth as: c/o Catherine C., 1846 Main Street, Hartford.[4] The process-server's affidavit, dated October 31, 1991, states that he was unable to make in hand service on both Jacqueline W. and Elke C., and had ascertained that they were not residing at the addresses reflected in the petition. On 10/31/91, DCYS filed a motion for an order of notice, based on the process-server's affidavit, requesting publication in the Hartford Courant; the motion was granted and, pursuant thereto, a legal advertisement ran November 5, 1991 regarding "Petition For Termination of Parental Rights [Of] Jacqueline . . [W.] and Elke . . [C.], of parts unknown." Service through legal publication was confirmed by the court (on the record) with respect to both parents on November 19, 1991.
Service has been effected in accordance with the requirements of law, and this court has jurisdiction to hear and adjudicate the instant petition. General Statutes Sections17a-112, 45a-716, and 45-717.
Standard of Proof
The term "termination of parental rights" is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child or the religious affiliation of the child." General Statutes Section 45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972); In Re Juvenile Appeal CT Page 5804 (Anonymous), 177 Conn. 648, 671, (1979).
The integrity of the family unit is protected by theNinth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. Stanley v. Illinois, supra. Both the child and the parent(s) have constitutionally protected interests in the integrity of the family. Santosky v. Kramer, 455 U.S. 75 (1982). And, the "rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions." See: In Re Juvenile Appeal, 187 Conn. 431, 435 (1982).
The constitutional guarantee of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing evidence, not merely a fair preponderance." Santosky v. Kramer, supra. Accordingly, the standard of proof as mandated by Conn. General Statute Section 17a-112(b) and Conn. Prac. Bk. 1049 is "clear and convincing" evidence. See: e.g. In Re Juvenile Appeal (84-3),1 Conn. App. 463 (1984).
Termination of parental rights is in two stages the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed. In Re Juvenile Appeal (84-AB), 192 254, 262 (1984); In Re Nicolina T., 9 Conn. App. 598, 604 (1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds may inquiry be made regarding the ultimate best interests of the child. In Re Juvenile Appeal (84-AB), supra at p. 262. However, since Section 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, one ground only need be established for the granting of the petition. In Re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (1984); In Re Nicolina T., supra.
Factual Findings
Neither the respondent/mother nor the respondent/father appeared for trial.[5] The evidence and the documentation before the court established the following material facts.
Respondent/mother, d/o/b 4/17/56, was born in Lakeland, Florida, moved to Hartford with her family in 1961, and has a tenth grade education. She has three children: Ghia W., d/o/b 1/3/73; Anika B., d/o/b 4/12/78; and Katrina C., d/o/b 3/19/87. Ghia W. is retarded and severely handicapped and, according to information in the file, resides in New Britain CT Page 5805 where she attends a highly specialized school.[6] Anika B. was placed in the home of her maternal aunt, Velma P., on April 12, 1991.[7]
On or about August 26, 1988, authorities were informed that respondent/mother had left her children alone at the South Park Inn, an emergency shelter for the homeless. The Hartford police transported the children to the home of Velma P., the maternal aunt; however, on or about August 29, 1988, Dorothy C., the maternal grandmother, notified DCYS that placement was needed for Jacqueline W.'s children. An OTC was obtained on August 30, 1988 and the children were placed in the Dorsey foster home. Gail C., the paternal aunt (of Katrina), maintained contact with the children; at that time, the only maternal family member stating an interest regarding the children was the maternal aunt, Velma P. Katrina C. was placed in the home of her paternal aunt, Gail C., on January 6, 1989; prior to this placement, DCYS was conducting a licensing study with respect to the paternal aunt's home. Katrina C. has resided continuously with Gail C. from 1/6/89 to date.
On October 14, 1988, respondent/mother agreed (in writing) to expectations which included: visit this child as often as the Department permits, keep DCYS informed of whereabouts and keep all appointments set by or with DCYS, participate in counselling as recommended, procure adequate housing, and comply with psychological evaluation. According to the evidence, visitation by the mother, during the initial period was very sporatic; thereafter, Jacqueline did not visit the child at all between November, 1989 and late May, 1990. Respondent/mother's whereabouts remained unknown until around July, 1990. As stated, the initial termination petition was filed on or about July 5, 1990; shortly thereafter, the mother contacted DCYS and visitation was again established with the child. Regular visitation, on a weekly basis, occurred between July, 1990 and December 27, 1990; there has been no visitation between the mother and the child since December 27, 1990.[8]
The DCYS worker spoke with Jacqueline W. on or about January 8, 1991. Apparently the mother had first lived on Burlington Street in Hartford, and later had obtained a two-bedroom apartment at the Nelton Court housing project; however, she indicated she could not take the child home. She stayed at Nelton Court until sometime in March, 1991; at a home visit on February 21, the mother indicated she was terminally ill with cancer and "did not want to be around" her daughter. On both February 21 and 28, 1991, the DCYS worker discussed with respondent/mother what she wished to do regarding Katrina C.; the mother did not desire to maintain regular visitation with the child, and put forth no specific plan for Katrina, who had been CT Page 5806 in placement since late August, 1988 (since 1/6/89 with Gail C.).[9]
Jacqueline W. has not contacted DCYS regarding Katrina C. since February 28, 1991; the Department is unaware of her whereabouts.[10]
As stated heretofore, respondent/mother's whereabouts had been previously unknown until July, 1990; upon contacting DCYS, counseling was arranged for Jacqueline W. at CFS (with her daughter Anika B.). Since respondent/mother did not consistently attend scheduled counselling appointments, her parenting skills and other issues relevant to reunification could not be addressed appropriately; Jacqueline W. last attended CFS counselling on January 14, 1991.
Katrina C. is a five year old child born 3/19/87 in Hartford to Jacqueline W. and Elke C.; as stated, the child has resided continuously since 1/6/89 in the home of her paternal aunt, Gail C. Initially, delays in Katrina's development were noted and the Newington Children's Hospital screening program found the child to be depressed and language delayed; DMR's Birth To 3 Program concluded that the little girl was delayed in the area of gross and fine motor skills and, accordingly, Katrina participated in Birth To 3 from October, 1989 to September, 1990. Tantrum episodes and other problematic conduct escalated, particularly following visitation; therefore, in early 1991, the child was seen by Dr. Mantell who, although indicating that a more complete diagnostic work-up might be advisable, acknowledged that increasing intensity regarding visitation involved the child in an emotional dilemma which was distressing, disorganizing, and confusing for her.[11] At the time of Dr. Mantell's evaluation, however, Katrina C.'s episodes had subsided substantially and, as of time of trial, there had been no further problems.
With respect to respondent/father, Elke C., he has not come forward with a plan for, or worked towards, reunification. He indicated to the worker that he is perfectly satisfied with the arrangement, that he does not have sufficient income to support the child, and does not have adequate housing as he resides with his mother, Catherine C. Respondent/father has no objection to a termination of his rights in order that the child may be adopted by his sister, Gail C., and has waived, in writing, any appearance in court.
Katrina C. has progressed exceedingly well while in the care of her paternal aunt, Gail C. The DCYS plan is for this child to be adopted by Gail C., the paternal aunt, with whom Katrina C. has resided, continuously, since January 6, 1989; Gail C. is most willing and eager to adopt Katrina C. Thus, the plan for Katrina C. is the provision of a permanent home through adoption. CT Page 5807
Adjudication
General Statutes Section 17a-112(b) delineates the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged statutory ground has been established by "clear and convincing" evidence; such degree of proof, as stated heretofore, is constitutionally mandated. The instant TPR petition was filed on October 22, 1991; on November 19, 1991, the petition was amended as to respondent/father to allege consent.
(a) Respondent/Father: Consent
On October 24, 1991, respondent/father, Elke C., executed the affidavit/consent to terminate parental rights which sets forth the meaning of statutory termination, as well as the rights to the child which are lost upon termination; the document certifies that it was read by the subscriber who stated he understood the contents of the instrument. On the same date, respondent/father executed, under oath, a waiver of his presence in court at any termination hearing.[12] Testimony was presented regarding the execution of the aforestated documents. Based on all of the aforesaid, the court finds that respondent/father has voluntarily and knowingly consented to termination of his parental rights with respect to the child Katrina C.
Section 17a-112(b) states, in pertinent part: "The superior court upon hearing and notice . . . may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interests of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child . . ."
The court hereby finds, applying and clear and convincing standard of proof, that petitioner has established the consensual ground for termination, as alleged, under Section 17a-112(b).
(b) Respondent/Mother: Abandonment
Respondent/mother visited with child only sporatically from the date of the OTC (8/30/88); thereafter, she did not visit the child at all from November 1989 to late May 1990, and her whereabouts were unknown until July, 1990. Only upon the filing of the initial termination petition was DCYS contacted by mother to reestablish visitation, and then mother failed to continue with the regular visitation beyond December 1990; respondent mother has not visited with the child at all since December 27, 1990. The mother is aware that Katrina C. is CT Page 5808 (and has been since 1/6/89) with the paternal aunt, yet does not visit with the child; Jacqueline W. has not come forward with any specific permanent plan for this five year old child who has been in placement since August 30, 1988.
General Statutes Section 17-112(b)(1) reads: "The superior court upon notice and hearing may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . ."
As stated, the child has been in placement since August, 1988; there have been protracted periods where respondent/mother has maintained little or no visitation with Katrina C. and has not even contacted DCYS regarding the child, or kept the agency informed of where, and through whom, she could be reached. While the mother did participate in regular visitation from late July through late December 1990. I cannot conclude, viewing the entire period of the child's placement that Jacqueline W. maintained a reasonable degree of interest, concern or responsibility regarding Katrina C.'s welfare. It is particularly relevant that the respondent has had no contact with the child since late December, 1990. The standard respecting statutory abandonment (as opposed to common-law abandonment), under Section 17a-112(b)(1), is "not whether the parents have shown some interest in their children", but rather, "[c]ommon sense dictates that a parent's obligations toward . . [a] child go further than a minimal interest." (Emphasis in original). In re Rayna M., 13 Conn. App. 23, 37 (1987).
The court hereby finds, applying a clear and convincing standard of proof, that petitioner has established statutory abandonment as a ground for the termination of the parental rights of Jacqueline W. to the child, Katrina C.
(c) Respondent/Mother: Failure to Rehabilitate
Katrina C. was committed as a uncared/homeless child on October 14, 1988; on that date both Jacqueline W. and her attorney signed the agreement setting forth the expectations visitation; keep appointments set by DCYS; keep agency informed of whereabouts; participate in counselling; procure adequate housing; and, comply with psychological evaluation. Respondent/mother has not maintained regular visitation with Katrina C., kept appointments with DCYS, kept DCYS informed of her CT Page 5809 whereabouts, followed through with counselling, or procured and maintained adequate housing. With respect to psychological evaluations, the termination study discloses that respondent mother did not cooperate in the court-ordered evaluations of November, 1988; she did participate in the parent/child interaction portion of the psychological conducted by Dr. Mantell on September 24, 1990, but did not keep her scheduled appointment for the individual evaluation on October 3, 1990.
General Statutes Section 17a-112(b)(2) provides, as follows: "The superior court upon hearing and notice . . . may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interest of the child and that . . . with respect to a nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child . . ." Katrina C. has been in placement since August, 1988; except for the period from late July 1990 to late December 1990, respondent/mother has not really cooperated at all in the efforts of DCYS to effectuate a reunification. She has not visited the child since December, 1990, and her whereabouts have been unknown for months. In the court's view, based on what has transpired during the protracted period of placement, and considering this little girl's age and needs, there is very little to encourage any belief that within a reasonable time Jacqueline W. could assume a responsible position in Katrina C.'s life.
The court hereby finds, applying a clear and convincing standard of proof, that petitioner has established as a statutory ground for termination that Jacqueline W. is the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of this child, she could assume a responsible position in the life of the child.
(d) Respondent/Mother: No Ongoing Parent-Child Relationship
Katrina C. was born March 19, 1987; she was approximately seventeen months old when DCYS obtained the OTC (8/3/88) and has not lived with her mother since that time. As stated, visitation by the mother with the child was quite sporatic following the initial placement(s) and from November 1989 to late Spring 1990, there was no visitation whatsoever; CT Page 5810 however, from July 1990 to December 27, 1990, while the child was approximately three and one-half years of age, there was regular weekly visitation between mother and child (all visitation having ceased thereafter).
General Statutes Section 17a-121(b)(4) provides the following: "The superior court upon hearing and notice . . . may grant . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to a nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of the parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. The statute involves the situation where a child has never known the parent and no such relationship ever developed, or where the child has clearly lost that relationship so that despite its existence, it now has been completely displaced. See: In re Juvenile Appeal (Anonymous),181 Conn. 638, 645-46 (1980); In re Shannon S., 41 Conn. Sup. 145,158 (1989). A troubled relationship between the parent and child is not a basis for a termination of parental rights; however, in applying the statute, "common sense" is to be utilized and "bizarre results" are to be avoided. In re Juvenile Appeal (84-6), 2 Conn. App. 705, 708-09 (1984). The feelings of the child toward the natural parent refers to those of a positive nature. In re James T., 9 Conn. App. 608, 616 (1987); In re Juvenile Appeal (84-6), supra at p. 709.
Jacqueline W. has had no day to day relationship with this child, or attended to, on a day to day basis, the physical, emotional, moral or education needs of Katrina C., since mid-1988. The child has been with Gail C. from January 1989, she refers to Gail C. as her "mommy", and she is not upset with the knowledge that Jackie W. cannot be found. Katrina C. has not been in her mother's care since the child was approximately seventeen months old; the child undoubtedly has some memories of her mother based on the July — December, 1990 visitation. However, any actual day to day parent-child relationship which may have existed prior to August 30, 1988 has been displaced with the day to day relationship which has developed between the child and the paternal aunt, Gail C. On the evidence, the court finds no ongoing parent-child relationship under Section 17a-112(b)(4).
Katrina C. has been in placement for over three years; respondent/mother did not appear for trial and is not CT Page 5811 working toward any reunification. The paternal aunt has been the child's continuous caretaker for three years and is eager to adopt; permanency and certainty are in the child's best interests. The biological mother has not visited the child since 1990, her whereabouts have remained unknown, and there has been no progress towards reunification over the three year placement. The court finds that to allow further time for the establishment or reestablishment of the parent-child relationship, as statutorily defined, would be detrimental to the best interests of Katrina C.
It is hereby found, applying a clear and convincing standard of proof, that petitioner has established that there exists no ongoing parent-child relationship between Jacqueline W. and Katrina C., which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child.
Disposition
General Statutes Section 17a-112(b) allows the granting of a petition to terminate parental rights only upon a showing, based upon clear and convincing evidence, that termination is in the best interests of the child. Additionally, the court must consider the six factors outlined in Section 17a-112(d). Evidence was last received in this case on February 4, 1992.
Katrina C. has done very well, and has made much progress in the loving, nurturing home of her paternal aunt. The child has been in the home, continuously, for over three years is very happy there, and refers to Gail C. as her "mommy"; the child is five years old and has had no contact with respondent/mother since 1990. Under the totality of the circumstances, a permanent, loving, nurturing home is in the child's best interests; permanency and certainty in this five-year old's life can be best, and appropriately, realized through termination of parental rights, thereby freeing the child for adoption by the paternal aunt, Gail C., which is the DCYS plan. It is hereby found, applying a standard of clear and convincing proof, that termination of parental rights to Katrina C. is in the best interests of the child.
With respect to respondent/mother (father having consented), the court has carefully considered the factors set forth in Section 17a-112(d)(1) through (6), and hereby finds, on clear and convincing evidence, the following: CT Page 5812
(1) DCYS undertook in a timely manner to work with respondent/mother to achieve reunification. Jacqueline W. did not follow through with counselling put in place. Efforts to facilitate visitation on the part of the agency were frustrated by the mother's failure, for long periods of time, to keep the worker advised of her whereabouts. Jacqueline W. did not cooperate with the efforts of the Department to reunite parent and child.
(2) Respondent/mother did not cooperate with the court ordered psychological evaluations in November, 1988. She participated in the parent/child interaction phase of the psychological conducted by Dr. Mantell on September 24, 1990, but did not keep her scheduled appointment for the individual evaluation on October 3, 1990.
Expectations were set as per the October 14, 1988 agreement; as stated heretofore, respondent/mother did not comply with, and/or follow through on, expectations regarding visitation on a continuing basis, counselling, housing, keeping the agency informed, etc.
(3) There is little evidence of feelings and emotional ties on the part of the child toward her biological mother, although the child has inquired, according to the testimony, about seeing her natural mother; as stated, the child was not upset upon being informed that Jacqueline W.'s whereabouts were unknown. The evidence indicated that Katrina C. is very fond of, and has feelings and emotional ties toward, her caretaker of over three years, the paternal aunt, Gail C.; as indicated, the child refers to Gail C. as her "mommy".
(4) Katrina C. was born on March 19, 1987; she is five years of age. Given the child's age, as well as the prolonged period of time that she has been in foster placement, permanency and certainty regarding her home situation are clearly consistent with Katrina C.'s best interests.
(5) The respondent/mother has not had contact with this child since December, 1990. However, over the three year plus period of placement, Jacqueline W. has made some effort to adjust her circumstances, conduct, and conditions with a view toward reunification. Although the initial visitation was sporatic, respondent/mother did cooperate with the Department, and maintain regular visitation, for the last five or six months of 1990. Also, she did procure the larger Nelton Court apartment, apparently contemplating the return of this child. Nevertheless, overshadowing those efforts are the protracted periods mother did not visit (and has not visited), her failure CT Page 5813 to maintain and continue with appropriate housing, long intervals where she could not be located, her failure to keep appointments and work with DCYS, her failure to follow through with counselling, etc. Overall, respondent/mother has not made a sustained effort to adjust her circumstances, conduct and conditions to make it in the best interests of this child to return to her home in the foreseeable future.
(6) The evidence does not support a finding that Jacqueline W. has been prevented in any way, or by anyone, or by economic circumstance, from maintaining a meaningful relationship with Katrina C.[13]
Petitioner has met its burden of proof by clear and convincing evidence; the best interests of Katrina C. will be served by freeing the child for adoption, and thereby affording the child the benefit of a loving, nurturing, permanent home.
It is found, by clear and convincing evidence, that termination of parental rights is in the best interests of Katrina C.; and, that with respect to respondent/mother, Jacqueline W., over an extended period which is not less than one year, one or more statutory grounds have existed for the termination of parental rights.
The petition (as amended) to terminate the parental rights of Jacqueline W. and Elke C. to the child Katrina C. is hereby Granted; and, the Department of Children and Youth Services is appointed Statutory Parent for the said Katrina C.
In accordance with General Statutes Section 17a-112(i), a case plan report shall be submitted to this court by the Commissioner within ninety (90) days, and thereafter as the court may require, but no less often than annually.
Mulcahy, J.